IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

UNITED STATES OF AMERICA                    PLAINTIFF/RESPONDENT

v.                        Criminal No. 5:19-cr-50083-TLB-MEF-4
                          Civil No. 5:21-cv-05112-TLB-MEF

CRAIG RYAN KELLEY                           DEFENDANT/MOVANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Currently before the Court is a Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody filed on June 22, 2021, by the *pro se* Defendant/Movant, Craig R. Kelley ("Kelley"). (ECF No. 305). The United States filed its response on July 12, 2021. (ECF No. 308). Kelley filed a reply on July 26, 2021. (ECF No. 309).

The matter is ready for report and recommendation.

## I.    BACKGROUND

The case involves a conspiracy to distribute methamphetamine in Northwest Arkansas. Kelley and several co-conspirators, DeJohn Lequor Alexander ("Alexander"), Joseph A. James ("James"), Marcus Alan Jones ("Jones"), and Michael James Smith ("Smith"), were initially indicted on August 16, 2019. (ECF No. 15). On November 20, 2019, a First Superseding Indictment was filed. (ECF No. 54). The First Superseding Indictment added two additional co-conspirators as defendants, Zeache Rose ("Rose") and Cherish Gibbons ("Gibbons").[1] *Id*. The charges against Kelley did not change. *Id*.

A Second Superseding Indictment was filed on March 4, 2020, charging Kelley with offenses in Counts One, Five, Seven, Eight, Ten and Eleven. (ECF No. 112). Count One alleged

---

[1] Cherish Gibbons has yet to be arrested.

1

that Kelley and six co-conspirators "did knowingly and intentionally combine, conspire, confederate and agree with each other, and with others known and unknown to the Grand Jury to distribute more than five hundred (500) grams of a mixture or substance that contained a detectible amount of methamphetamine." *Id*. at 1. Counts Five, Seven, and Eight charged Kelley with the distribution of more than five grams of methamphetamine on specified dates. *Id*. at 2-4. Count Ten charged that Kelley "did knowingly use and carry a firearm, . . . during and in relation to a drug trafficking crime . . . that is, knowingly and intentionally distributing more than five (5) grams of methamphetamine, . . . which is the offense described in Count Five." *Id*. at 4-5. Count Eleven charged that Kelley "knowing that he had been convicted of a crime punishable by imprisonment for a term exceeding one year, did knowingly possess [a firearm] . . . said firearm having been shipped and transported in interstate commerce." *Id*. at 5.

On May 1, 2020, Kelley appeared with counsel before the Honorable Timothy L. Brooks, U. S. District Judge, for a change of plea hearing. (ECF No. 141). Pursuant to a written Plea Agreement, Kelley entered a plea of guilty to Count Eight of the Second Superseding Indictment, charging him with the knowing and intentional distribution of more than five (5) grams of methamphetamine on or about April 25, 2019. (ECF No. 142, ¶¶ 1, 5 (26.089 grams of actual methamphetamine)). The Court determined that Kelley's guilty plea was voluntary, supported by a factual basis, and his guilty plea was accepted. (ECF No. 141 at 2). Sentencing was deferred pending a presentence investigation. *Id*.

The Initial Presentence Investigation Report ("PSR") was filed on June 30, 2020. (ECF No. 148). Kelley was reported to be accountable for a total amount of 4.334 kilograms of methamphetamine (actual); his total offense level was calculated as 35; his criminal history

category as VI because he was a career offender; and the advisory guideline range as 292-365 months.[2] *Id*. at 12, 13, 21, 32.  Kelley filed objections (ECF No. 166) to the Initial PSR on July 7, 2020, amended objections (ECF No. 178) on July 21, 2020, and second amended objections (ECF No. 188) on July 27, 2020.

The only objection Kelley made which had a bearing on the Guidelines calculation was his objection to paragraphs 38 through 41 of the Initial PSR.  (ECF No. 188 at 1).  These paragraphs described the seizure of methamphetamine from Kelley's vehicle in New Mexico on May 19, 2019.[3]  (ECF No. 148 at 9).  Kelley was driving the vehicle and co-defendant Joseph James was a passenger in the vehicle.  *Id*.  The vehicle had been tracked using a pen register device on James' cellphone and real-time Global Positioning System ("GPS") monitoring.  *Id*.  The vehicle was stopped and searched in Albuquerque, New Mexico.  *Id*.  A backpack located in the rear seat of the vehicle contained 5.52 kilograms of suspected methamphetamine.  *Id.*  Kelley declined to speak with agents following the stop.  *Id*.  James admitted he had agreed to transport the drugs from Los Angeles, California, to Northwest Arkansas, and that the drugs were delivered to him in a backpack.  *Id*.  James initially stated Kelley had no knowledge of the drug transaction.  *Id*. at 10.  Responding to this objection, the Probation Officer added a paragraph 40a in the Final PSR which stated that James later met with agents of Homeland Security Investigations and "admitted to conspiring with Kelley to purchase the methamphetamine in California, and that both he and Kelley would be benefiting financially from that purchase."  (ECF No. 197 at 10; ECF No. 197-1 at 2).  Further, it was noted that James later appeared at a hearing and "testified under oath as to

---

[2] The United States Sentencing Commission Guidelines Manual for 2018 was used in preparing the PSR.  (ECF No. 148, ¶ 56).

[3] Kelley's objection states the date of seizure as May 20, 2019.  (ECF No. 188, ¶ 1).

both his and Kelley's involvement in purchasing the methamphetamine in California during May of 2019, prior to being apprehended with that methamphetamine in New Mexico." (ECF No. 197 at 10). Specifically, James stated they traveled to California to purchase the methamphetamine themselves because they "were out." *Id.*

Kelley appeared for sentencing on August 12, 2020. (ECF No. 202). He persisted in his argument that there was no evidence he had knowledge of the drugs when his vehicle was stopped in New Mexico on May 19, 2019. (ECF No. 288 at 15-17, 20). He relied on James' initial statement made on the date of the stop and seizure that Kelley had no knowledge about the drugs. *Id.* Judge Brooks disagreed, finding that under the doctrines of constructive possession and relevant conduct Kelley was accountable for the quantity of actual methamphetamine seized from his vehicle in New Mexico. *Id.* at 21-24.

Kelley was sentenced to a term of 240 months imprisonment, five years supervised release, a $3,900 fine, and a $100 special assessment. (ECF No. 202; ECF No. 288 at 45-46, 48). Judgment was entered on August 19, 2020. (ECF No. 203). Kelley did not pursue a direct appeal.[4]

On June 22, 2021, Kelley timely filed his § 2255 motion now before the Court. (ECF No. 305). In his supporting brief (ECF No. 306), Kelley essentially sets forth four grounds for relief, which the Court summarizes as follows: (1) his guilty plea was involuntary because defense counsel informed him that he would face a Guidelines sentence somewhere around 60-120 months imprisonment; (2) his guilty plea was involuntary because he did not understand "relevant conduct" and how it would be used at sentencing; (3) defense counsel was ineffective for failing to properly prepare and investigate the relevant sentencing guidelines and current law,

---

[4] In his § 2255 Motion, Kelley states he did not appeal because of an appeal waiver. (ECF No. 305 at 3). There is, however, no appeal waiver contained in his Plea Agreement. (ECF No. 142).

withdrawing objections to the PSR and stipulating to things in camera and off the record that defendant had no knowledge of prior to or after entering his guilty plea; and (4) error by the Court in using drug quantities involved in dismissed conduct when calculating the Guidelines range. (ECF No. 306 at 6-11).

## II.    DISCUSSION

"A prisoner in custody under sentence . . . claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence."  28 U.S.C. § 2255(a).  "If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate."  28 U.S.C. § 2255(b).  A thorough review of Kelley's § 2255 motion and the files and records of this case conclusively shows that Kelley is not entitled to relief, and the denial and dismissal of his § 2255 motion with prejudice is recommended.

### A.    Effect of a Guilty Plea

It is well established that a defendant who enters a guilty plea waives all non-jurisdictional defenses.  *Tollett v. Henderson*, 411 U.S. 258, 266 (1973) (guilty pleas in the *Brady*[5] trilogy were

---

[5] *Brady v. United States*, 397 U.S. 742 (1970).

found to foreclose direct inquiry into the merits of claimed antecedent constitutional violations); *Smith v. United States*, 876 F.2d 655, 657 (8th Cir. 1989) ("In pleading guilty, a defendant waives all challenges to the prosecution except those related to jurisdiction," including claims regarding search and seizure), *cert. denied*, 493 U.S. 869 (1989). Thus, under the *Tollett* line of cases, a defendant who voluntarily and intelligently enters a plea of guilty is precluded from later obtaining collateral review of antecedent non-jurisdictional defects.

When a guilty plea is entered, the focus of a subsequent collateral attack must remain limited to the nature of counsel's advice and the voluntariness of the guilty plea. *Bass v. United States*, 739 F.2d 405, 406 (8th Cir. 1984) (citing *Tollett*, 411 U.S. at 266). As the Court in *Tollett* observed:

> ". . . a guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, *he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea* by showing that the advise he received from counsel was not within the standards set forth in *McMann*.[6]
>
> A guilty plea, voluntarily and intelligently entered, may not be vacated because the defendant was not advised of every conceivable constitutional plea in abatement he might have to the charge . . . And just as it is not sufficient for the criminal defendant seeking to set aside such a plea to show that his counsel in retrospect may not have correctly appraised the constitutional significance of certain historical facts, (internal citation omitted) it is likewise not sufficient that he show that if counsel had pursued a certain factual inquiry such a pursuit would have uncovered a possible constitutional infirmity in the proceedings." *Id*. at 267. (Emphasis added.)

---

[6] *McMann v. Richardson*, 397 U.S. 759, 771 (1970) (If a prisoner pleads guilty on the advice of counsel, he must demonstrate that the advice was not "within the range of competence demanded of attorneys in criminal cases.")

The rationale and ruling of *Tollett*, while a decision concerning a state prisoner's habeas claims, has been adopted by the Eighth Circuit for application to motions made by federal prisoners under 28 U.S.C. § 2255.  *See Bass*, 739 F.2d at 406.

The standard for determining the validity of a guilty plea remains whether it "represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970), citing *Boykin v. Alabama*, 395 U.S. 238, 242 (1969); *Machibroda v. United States*, 368 U.S. 487, 493 (1962); and *Kercheval v. United States*, 274 U.S. 220, 223 (1927).  "While a guilty plea taken in open court is not invulnerable to collateral attack in a post conviction proceeding, the defendant's representations during the plea-taking carry a strong presumption of verity and pose a 'formidable barrier in any subsequent collateral proceedings.'"  *Nguyen v. United States*, 114 F.3d 699, 703 (8th Cir. 1997) (quoting *Voytik v. United States*, 778 F.2d 1306, 1308 (8th Cir. 1985)).  A defendant has a heavy burden to overcome those admissions and show that his guilty plea was involuntary.  *Blackledge v. Allison*, 431 U.S. 63, 72-74 (1977).

### B.    Standards Applicable to Ineffective Assistance of Counsel Claims

To prove a claim of ineffective assistance of counsel, a criminal defendant must demonstrate both that counsel's performance was deficient, and that counsel's deficient performance prejudiced the defense.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To establish the deficient performance prong of the *Strickland* test, one must show that counsel's representation fell below the "range of competence demanded of attorneys in criminal cases."  *Id*. at 688.  Review of counsel's performance is highly deferential, and there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  *Id*. at 689.

Moreover, "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *United States v. Rice*, 449 F.3d 887, 897 (8th Cir. 2006) (quoting *Strickland*, 466 U.S. at 690). Courts also "do not use hindsight to question counsel's performance," but instead must analyze it according to counsel's situation at the time of the allegedly incompetent act or omission. *Kenley v. Armontrout*, 937 F.2d 1298, 1303 (8th Cir. 1991). If one fails to establish deficient performance by counsel, the court need proceed no further in its analysis of an ineffective assistance of counsel claim. *United States v. Walker*, 324 F.3d 1032, 1040 (8th Cir. 2003).

To establish the prejudice prong of the *Strickland* test, one must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. The United States Supreme Court has clarified that the proper prejudice analysis is whether "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993) (quoting *Strickland*, 466 U.S. at 687).

### C.    Analysis

### 1.  Promise of a Specific Sentence Range

For his first ground for habeas relief, Kelley asserts that his guilty plea was involuntary because defense counsel told him "that he would face a Guidelines sentence somewhere around 60-120 months imprisonment," and instructed him that if the Court asked him if anyone made any promises or threats to encourage him to plead guilty "he was to answer 'no' because his attorney, the prosecutor and the Judge had worked everything out 'off the record.'" (ECF No. 306 at 6). He claims his guilty plea is invalid because it was "induced by misrepresentations, including

8

unfilfilled (sic) or unfulfillable promises." *Id*. The record in this case, including the written Plea Agreement and the Court's colloquy with Kelley at the change of plea hearing, shows that Kelley's guilty plea was voluntary and made with full knowledge of its consequences.

By signing the written Plea Agreement, Kelley admitted that he had fully discussed with defense counsel the facts of the case and the elements of the crime to which he was pleading guilty. (ECF No. 142, ¶ 5). He further admitted he had committed each of the elements of the crime to which he was pleading guilty and that there was a factual basis for his guilty plea. *Id*. He made additional representations in the Plea Agreement, including the following: that he had read the Plea Agreement and had carefully reviewed every part of it with defense counsel; that he fully understood the Plea Agreement; that no promises, agreements, understandings, or conditions had been made or entered into in connection with his decision to plead guilty except those set forth in the Plea Agreement; that he was satisfied with the legal services provided by defense counsel in connection with the Plea Agreement and matters related to it; and, that he entered into the Plea Agreement freely, voluntarily, and without reservation, and his desire to enter a plea of guilty was not the result of threats or coercion directed at him or anyone connected with him. *Id*., ¶ 30. The Plea Agreement set out the maximum penalties for the offense he was pleading guilty to, including a mandatory minimum term of imprisonment for five years and a maximum term of imprisonment for 40 years, *Id*., ¶ 12, and of particular significance to his first ground for relief, Kelley explicitly acknowledged that the Plea Agreement did not promise a specific sentence, *Id*., ¶ 17.

Moreover, the colloquy between the Court and Kelley during his change of plea hearing on May 1, 2020, demonstrates that his guilty plea was voluntary and that he understood the Court was not bound to impose any specific sentence. Kelley expressed satisfaction with his counsel.

9

(ECF No. 287 at 9-10).  He acknowledged an understanding of the charges against him, and specifically Count Eight of the Second Superseding Indictment charging him with distributing more than five grams of methamphetamine.  *Id*. at 11-12.  The Court advised Kelley of the potential consequences of being convicted of that offense, explaining that it carried a mandatory minimum sentence of not less than five years imprisonment and a maximum sentence of up to 40 years imprisonment, and Kelley stated he understood.  *Id*. at 12-13.  Kelley confirmed that nobody forced him in any way to plead guilty; nobody threatened him or a loved one with harm if he did not plead guilty; and that his desire to plead guilty to Count Eight was something he was doing voluntarily and completely of his own free will.  *Id*. at 13-14.

Kelley acknowledged that he had reviewed the Plea Agreement with his counsel, that counsel had explained the terms and effects of the agreement to him, and that he had signed the agreement.  (ECF No. 287 at 14).  The Court made clear to Kelley that it was not bound by any term or provision of the Plea Agreement, and that Kelley was subject to being sentenced to any lawful punishment within the statutory minimum and maximum.  *Id*. at 15.  Kelley said he understood.  *Id*.  The Court asked Kelley if defense counsel had promised him that the Court would impose any particular sentence, and Kelley confirmed that counsel had not done so.  *Id*. at 16.  The Court informed Kelley that "no one, including this Court, can possibly know at this time what would be the most appropriate sentence for you," explaining that a presentence investigation would be ordered and that "the Court will only be able to discern its judgment as to sentence after it reviews that information."  *Id*.  Kelley was told of the advisory nature of the Guidelines sentencing range, and that subject to the statutory minimum and maximum, the Court had discretion to sentence either within the Guidelines range, or perhaps below the Guidelines range, or perhaps

10

above the Guidelines range.  *Id*. at 17.  Kelley stated that he understood.  *Id*.  The Court next explained the sentencing factors to Kelley, stating that "only after considering all of these other factors that I've just described as applied to the facts of your case, only in that fashion can the Court determine whether the guideline range of punishment is appropriate for you or not," and again, Kelley expressed his understanding.  *Id*. at 17-18.

As the Third Circuit noted in *Zilich v. Reid*, 36 F.3d 317, 320 (3rd Cir. 1994), the very purpose of the plea colloquy is to "uncover hidden promises or representations as to the consequences of a guilty plea."  Here, the Court made a thorough inquiry regarding Kelley's understanding of the Plea Agreement, the presentence investigation process, the sentencing factors, and that subject to the statutory minimum and maximum the Court was not bound to impose any specific sentence.  Kelley acknowledged, under oath, his understanding of these matters and explicitly stated that no such promises or representations had been made to him by defense counsel.  His sworn statements during the change of plea colloquy "ought not to be lightly cast aside."  *Id*.; *Nguyen*, 114 F.3d at 703.

Kelley's claim also fails because it "founders on abundant circuit precedent holding that inaccurate advice of counsel about the sentencing guidelines or likely punishment does not render involuntary a defendant's decision to plead guilty, so long as the defendant is informed of the maximum possible sentence permitted by statute and the court's ability to sentence within that range." *United States v. Quiroga*, 554 F.3d 1150, 1155 (8th Cir. 2009) (internal citations omitted). It has long been recognized in the Eighth Circuit that "as long as the district court tells a defendant the statutory range of punishment that he faces and informs him that the sentencing guidelines will be used in determining the sentence, the plea is binding," and "*[t]his is true even when the*

*misunderstanding is caused by defense counsel's erroneous estimation of what the ultimate sentence will be.*" *United States v. Vennes*, 103 F. Supp.3d 979, 996 (D.MN. 2015) (emphasis in original) (quoting *United States v. Ramirez-Hernandez*, 449 F.3d 824, 826 (8th Cir. 2006). "In other words, a defendant cannot show he was prejudiced from his attorney's advice, no matter how inaccurate it might have been, if the district court essentially cures that inaccurate advice by correctly informing the defendant of his potential sentence." *Id.*

The Plea Agreement advised Kelley of the maximum penalties for the offense he was pleading guilty to, including a mandatory minimum term of imprisonment for five years and a maximum term of imprisonment for 40 years. (ECF No. 142, ¶ 12). Kelley acknowledged that the Plea Agreement did not promise a specific sentence. *Id.*, ¶ 17. The Court clearly informed Kelley during his change of plea hearing of the potential sentence that could be imposed upon his conviction of Count Eight of the Second Amended Indictment. (ECF No. 287 at 12-13). And Kelley told the Court under oath that his counsel had not promised him that the Court would impose any particular sentence. *Id.* at 16. Kelley has presented no credible evidence to overcome such clear proof of a voluntary and informed decision to plead guilty, and his first ground for relief fails as a matter of law.

### 2. Failure to Advise of Relevant Conduct

Kelley next claims that his guilty plea could not be voluntary because he did not understand "relevant conduct" and how it would be used at sentencing. (ECF No. 306 at 6). Citing *United States v. Resinos*, 623 F.3d 616, 618 (8th Cir. 2010), Kelley asserts that "the only drug quantities that may trigger a mandatory minimum sentence for a discrete violation of § 841(a) are those involved in the count of conviction," and he alleges ineffective assistance of counsel for "not

following the law as it existed at the time of sentencing." *Id*. at 7-8. *Resinos* is not implicated in this case, and Kelley's claim is belied by the record which unequivocally shows that he was informed, and understood, that relevant conduct could be considered by the Court at sentencing.

First, the Eighth Circuit's ruling in *Resinos* is inapplicable here because no aggregate drug quantity was used to trigger Kelley's mandatory minimum sentence. Kelley pleaded guilty to Count Eight of the Second Superseding Indictment charging him with distribution of more than five (5) grams of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 841(b)(1)(B)(viii). (ECF No. 142, ¶ 1; ECF No. 287 at 20-22). Count Eight involved 26.08 grams of methamphetamine. (ECF No. 287 at 21; ECF No. 197, ¶ 36). Given that amount of methamphetamine, and pursuant to 21 U.S.C. § 841(b)(1)(B)(viii), Kelley was subject to a mandatory minimum term of imprisonment for five years. Kelley was informed of this five-year mandatory minimum sentence, and the 40-year statutory maximum, at his change of plea hearing, and he stated that he understood. (ECF No. 287 at 12-13). Thus, the record makes clear that no drug quantity other than the 26.08 grams of methamphetamine involved in Count Eight, the count of conviction, was used in triggering his mandatory minimum sentence, and his argument based on *Resinos* has no merit.

As to Kelley's allegation that he did not understand "relevant conduct" and how it could be used at sentencing, the Court initially notes that Kelley had no physical or mental disabilities that impaired his ability to understand the terms of the plea agreement, including the provision regarding relevant conduct, or his ability to understand Judge Brooks' explanation of the concept of relevant conduct during the change of plea hearing. (ECF No. 197 at 30; ECF No. 287 at 9). There was no language barrier; Kelley had graduated high school, and he had furthered his

education in college and by obtaining a certification as an electrician.  (ECF No. 197 at 31; ECF No. 287 at 8).

The Plea Agreement contained the following provision regarding relevant conduct:

> At the sentencing hearing, the United States will be permitted to bring to the Court's attention, and the Court will be permitted to consider, all relevant information with respect to the Defendant's background, character and conduct, *including the conduct that is the subject of this investigation for which he has not been charged up to the date of this Agreement, and/or which is the basis for any of the counts which will be dismissed* pursuant to this [A]greement, as provided by § 1B1.3 of the Sentencing Guidelines.  (ECF No. 142 at 8, ¶ 18) (emphasis added).

This provision of the Plea Agreement is consistent with the background comment to U.S.S.G. § 1B1.3, which provides in pertinent part (emphasis added), "in a drug distribution case, quantities and types of drugs not specified in the count of conviction *are to be included in determining the offense level* if they were part of the same course of conduct or part of a common scheme or plan as the count of conviction."

By signing the Plea Agreement, Kelley represented that he had read the agreement (or had it read to him), and he carefully reviewed every part of it with defense counsel; that he fully understood the agreement and was not under the influence of anything that could impede his ability to fully understand the agreement; that no promises, agreements, understandings, or conditions had been made or entered into in connection with the decision to plead guilty except those set forth in the agreement; that he was satisfied with the legal services provided by defense counsel in connection with the agreement and matters related to it; and, that he had entered into the Plea Agreement freely, voluntarily, and without reservation, and his desire to enter a plea of guilty was not the result of threats or coercion directed at him or anyone connected with him.  (ECF No. 142 at 11, ¶ 30).  Defense counsel, Mr. Christopher Smiley, represented that he had carefully reviewed

14

every part of the agreement with Kelley; that he had explained the ramifications of the agreement to Kelley, and he believed Kelley understood the agreement, including what rights were being lost by pleading guilty, and what the United States agreed to do in exchange for the plea of guilty; and that he believed Kelley's decision to enter into the agreement was an informed and voluntary one. *Id.* at 11, ¶ 31.

During the change of plea hearing on May 1, 2020, Kelley was asked a series of questions regarding his counsel.  Kelley responded that he was satisfied with the amount of time Mr. Smiley worked on the case; that Mr. Smiley had explained the nature of the charges against him and answered all his questions; and Kelley stated that he was fully satisfied with Mr. Smiley's legal services and representation.  (ECF No. 287 at 9-10).

Judge Brooks also thoroughly explained the concept of relevant conduct during the change of plea hearing.  (ECF No. 287 at 18-19).  Kelley was advised that the concept: "allows the government to bring any and all information about you that the government has developed as a result of its investigation in this case.  This information can be brought to the Court's attention and the Court may use it for sentencing purposes, regardless of whether it has to do specifically with this particular incident of distribution as charged in Count Eight."  *Id.*  Kelley was specifically informed that the Court could consider the factual circumstances pertaining to the other charges against him in the indictment, and even uncharged conduct could be considered "as long as it's related to the charge in which you were ultimately investigated and convicted."  *Id.* at 19.  Kelley, under oath, told the Court that he understood.  *Id.*

Thus, the record plainly shows that Kelley was under no physical or mental impairments which could have adversely affected his ability to understand the Plea Agreement.  The concept of

relevant conduct was explicitly addressed in the written Plea Agreement, which Kelley acknowledged reading, discussing with his counsel, and understanding. And the concept of relevant conduct was explained in detail to Kelley by the Court during the change of plea hearing, with Kelley again expressing his understanding. All of this occurred prior to the entry of Kelley's guilty plea to Count Eight of the Second Superseding Indictment. Accordingly, Kelley has failed to demonstrate any deficient performance by his counsel regarding the Court's consideration of relevant conduct at sentencing.

Since Kelley has failed to establish that his counsel's performance was deficient regarding the Court's consideration of relevant conduct at sentencing, there is no need to address the second *Strickland* prong of prejudice. *Walker*, 324 F.3d at 1040 (if a movant fails to show deficient performance by counsel, the court need proceed no further in its analysis of an "ineffective assistance" claim). Even so, Kelley cannot establish prejudice. As the Final PSR makes clear, Kelley was held accountable for 45.54 grams of methamphetamine on April 10, 2019 (Count Five), 55.16 grams of methamphetamine on April 22, 2019 (Count Seven), 26.08 grams of methamphetamine on April 25, 2019 (Count Eight), and the 4.208 kilograms of methamphetamine on May 20, 2019 (the drugs seized from Kelley's vehicle in New Mexico), for a total amount of 4.334 kilograms of methamphetamine. (ECF No. 197 at 12, ¶ 52). Thus, the drug quantities Kelley was held accountable for were from those transactions and/or seizures he was directly involved in, and the Court properly considered such relevant conduct at sentencing.

Kelley is entitled to no relief on this claim.

### 3.  Failure to Prepare for Sentencing

For his third ground for relief, Kelley argues that defense counsel was ineffective for

"failing to properly prepare and/or investigate the relevant sentencing guidelines and current law, withdrawing objections to the PSI and stipulating to things in camera and off the record that defendant had no knowledge of prior to or after entering his guilty plea." (ECF No. 306 at 8-9). Kelley alleges that he "objected to both the PSR's determination of drug quantity and the enhancements," but that these objections were withdrawn at sentencing as part of a stipulation whereby the Government agreed he should be held accountable for 4.334 kilograms of actual methamphetamine and an adjusted offense level of 38. (*Id*. at 9). Kelley complains that "had counsel diligently pursued research of the relevant Eighth Circuit precedence which forbids aggregating dismissed conduct into the total offensive sentencing calculation then [he] would not have received an unreasonable sentence of 20 years," and "no rational attorney would have allow[ed] the court to rely on dismissed conduct" to determine drug quantity. (*Id*. at 9-10). Kelley's claim is contrary to the law, there was no deficient performance by defense counsel at sentencing, and the claim should be denied.

Initially, it is apparent from a review of the record that nothing was stipulated to "in camera and off the record," as the Court openly addressed the stipulation during the sentencing hearing on August 12, 2020. (ECF No. 288 at 11). And, contrary to Kelley's claim, the stipulation was not that Kelley be held accountable for 4.334 kilograms of actual methamphetamine and a base offense level of 38, but only that the Court may receive in evidence and consider at the sentencing hearing a transcript of the grand jury testimony of Joseph James, an indicted co-conspirator. *Id*.

The Court made clear that the critical objection to the PSR had to do with the drug quantity Kelley was accountable for, and that Kelley objected to any drug quantity involving more than the 26.08 grams of methamphetamine associated with Count Eight - the count of conviction. (ECF

No. 288 at 12-13).    The Court noted that as the objection related to the quantity of methamphetamine found in the vehicle Kelley was driving in Albuquerque, New Mexico on May 20, 2019, that Kelley was relying on Mr. James' initial statement to law enforcement that the methamphetamine belonged to him, and that Kelley knew nothing about it. *Id*. at 13-14. The Court also acknowledged the Government's response to Kelley's objection: that Mr. James subsequently gave a different story in a proffer in which he detailed that he and Kelley were methamphetamine distributors who had travelled to California to stock up on methamphetamine with the intent of distributing it, and that Kelley did, in fact, know that the methamphetamine was in the vehicle. *Id*. at 14.

Arguing in support of Kelley's objection, Mr. Smiley pointed out "there was no elaboration as to anything" in Mr. James' grand jury testimony, only that Mr. James responded "yes" when asked if Kelley was aware of what was going on and was part of the transaction. (ECF No. 288 at 15). Mr. Smiley argued the Government had not met its burden of proof, and that the amount of methamphetamine from the New Mexico traffic stop should not be included in Kelley's sentencing guidelines calculation. *Id*. at 17. He also explained that while Kelley did not object to the reported content of PSR paragraph 40(a), i.e., that Mr. James "later met with agents and admitted to conspiring with Kelley to purchase the methamphetamine in California," he did object and disagree that was what actually happened. *Id*. He reasserted that Kelley "simply denies any involvement regarding it, that he had any knowledge of it, nor was he a willing participant in it." *Id*. at 20.

Overruling the objection, Judge Brooks found that under the doctrines of constructive possession and relevant conduct Kelley was accountable for the quantity of methamphetamine

seized in New Mexico. (ECF No. 288 at 21). Judge Brooks discussed the elements of constructive possession, noting that "it's really the knowledge prong that is in dispute here," and that Mr. James' initial statement to law enforcement had to be considered in the context of all the evidence before the Court. *Id*. at 21-22. Such evidence, the Court observed, included undisputed facts in the PSR that Kelley is, in fact, a methamphetamine dealer, and one who has been a participant in multiple controlled transactions with law enforcement. *Id*. It was also known that Mr. James was a methamphetamine distributor, and Judge Brooks found Mr. James' subsequent story to be much more likely to be true than his initial story because the initial story "doesn't make any sense," noting that if one were to take the trouble and all the time to drive to California to see the Pacific Ocean, one might think they would stay there longer than one night in a motel in Los Angeles. *Id*. at 22-23. Additional context was that the vehicle was being tracked by law enforcement. *Id*. at 23. So, considering the full context of Mr. James' initial statement to law enforcement that Kelley was unaware of the methamphetamine, the Court found that statement not to be credible, and that his subsequent statements and grand jury testimony were more than sufficient to establish the knowledge prong of constructive possession. *Id*. The Court further found that through the concept of relevant conduct under U.S.S.G. § 1B1.3, the quantity of methamphetamine seized in New Mexico was attributable to Kelley. *Id*. at 24.

That the Court overruled the objection regarding the drug quantity from New Mexico does not make counsel's action ineffective. *See Flieger v. Delo*, 16 F.3d 878, 886 (8th Cir. 1994) (citing *Riley v. Wyrick*, 712 F.2d 382, 385 (8th Cir. 1983)) (trial counsel's reasonable trial strategies cannot constitute ineffective assistance, even if they are unsuccessful); *James v. Iowa*, 100 F.3d 586, 590 (8th Cir. 1996) (reasonable trial strategy does not constitute ineffective assistance of

counsel simply because it was not successful); *Dible v. Ault*, No. C99-4010-MWB, 2000 WL 34033036 at * 20 (N.D. Iowa Oct. 20, 2000) (same).

Moreover, Kelley's claim that drug quantities associated with dismissed conduct cannot be used to determine the drug quantity for base offense level is contrary to the Guidelines and Eighth Circuit precedent. "The base offense level for drug offenses under the Guidelines is based upon drug quantity, which may include types and quantities of drugs not specified in the count of conviction if they are relevant conduct." *United States v. Thomas*, 760 F.3d 879, 888 (8th Cir. 2014) (citing *United States v. Ault*, 446 F.3d 821, 823 (8th Cir. 2006)). And relevant conduct includes "all acts or omissions of the defendant that were part of the same course of conduct or common scheme or plan as the offense of conviction." *Id.*; *see also United States v. Lawrence*, 854 F.3d 462, 467 (8th Cir. 2017) (citing U.S.S.G. § 1B1.3(a)(2)). Further, as noted above, U.S.S.G. § 1B1.3, cmt. (backg'd), provides in pertinent part (emphasis added), "in a drug distribution case, quantities and types of drugs not specified in the count of conviction *are to be included in determining the offense level* if they were part of the same course of conduct or part of a common scheme or plan as the count of conviction."

The Government correctly points out that when applying the relevant conduct provision of U.S.S.G. § 1B1.3 in drug distribution cases, the Eighth Circuit has repeatedly held that drug quantities not involved in the count of conviction are properly considered in determining the base offense level. *See, e.g., United States v. Murray*, 67 F.3d 687, 690 (8th Cir. 1995) (a court may enhance a defendant's sentence by considering quantities of drugs for which the defendant was neither indicted nor convicted, or for which the count was dismissed pursuant to a plea agreement); *United States v. Gordon*, 510 F.3d 811, 817 (8th Cir. 2007) (district court may consider as relevant

conduct all drugs the government shows by a preponderance of the evidence were a part of the same course of conduct or common scheme as the conspiracy); *United States v. Anderson*, 243 F.3d 478, 485 (8th Cir. 2001) (uncharged incidents several years earlier involved same course of conduct or common scheme or plan as offense of conviction and thus were relevant conduct); *United States v. White*, 447 F.3d 1029, 1032 (8th Cir. 2006) (drug amounts related to dismissed indictment were part of the same course of conduct); *United States v. Mahone*, 688 F.3d 907, 910 (8th Cir. 2012) (relevant conduct includes uncharged conduct that is part of the same course of conduct as the offense of conviction); and *United States v. Berry*, 930 F.3d 997, 999 (8th Cir. 2019) (uncharged conduct from two years earlier properly considered as relevant conduct).

Finally, Kelley's argument is also undermined by his Plea Agreement, in which he specifically agreed that the United States would be permitted to bring to the Court's attention, and the Court would be permitted to consider, "all relevant information with respect to Defendant's background, character and conduct, including the conduct that is the subject of this investigation for which he has not been charged up to the date of this Agreement, and/or *which is the basis for any of the counts which will be dismissed pursuant to this agreement*, as provided by § 1B1.3 of the Sentencing Guidelines."  (ECF No. 142, ¶ 18) (emphasis added).

Failure to raise a meritless argument does not constitute ineffective assistance of counsel. *Larson v. United States*, 905 F.2d 218, 219 (8th Cir. 1990); *Rodriguez v. United States*, 17 F.3d 225, 226 (8th Cir. 1994); *Haney v. United States*, 962 F.3d 370, 374 (8th Cir. 2020) (where the sentencing argument had no merit, counsel was not ineffective in declining to advance it).  Since Kelley has failed to show that his counsel's performance was deficient regarding this issue, there is no need to address the second *Strickland* prong of prejudice.  *Walker*, 324 F.3d at 1040.

Accordingly, Kelley's claim that his attorney was constitutionally deficient for not preparing for sentencing and permitting Kelley's base offense level to be elevated based on drug quantities associated with uncharged and dismissed conduct is contrary to both the law and his own agreement with the United States. This ground for relief has no merit and should be denied.

### 4.   No Error in Calculating Guidelines Range

Kelley's final ground for relief is his claim that the Court erred in using drug quantities involved in dismissed conduct when calculating the Guidelines range. He contends the Court committed error "when misapplying the relevant conduct standards to dismissed conduct arising from the over-all conspiracy charges that were not tied together and plead guilty by the Defendant." (ECF No. 306 at 10). In essence, he argues the Court erred in using dismissed conduct to calculate drug quantity for sentencing purposes, and that only the drug quantity involved in the count of conviction should have been considered. *Id*. at 11. Kelley has procedurally defaulted the claim, it is not cognizable in a § 2255 proceeding, and as previously discussed above, the claim is contrary to the law and his own plea agreement with the Government.

The failure to raise an issue on direct appeal ordinarily constitutes a procedural default and precludes a defendant's ability to raise that issue for the first time in a § 2255 motion. *Dejan v. United States*, 208 F.3d 682, 685 (8th Cir. 2000). When a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate "cause" and actual "prejudice," or that he is actually innocent. *Bousley v. United States*, 523 U.S. 614, 622 (1998); *United States v. Apfel*, 97 F.3d 1074, 1076 (8th Cir. 1996); and *United States v. Frady*, 456 U.S. 152, 167-68 (1982). "For cause to exist, the external impediment, whether it be governmental interference or the reasonable unavailability of the factual

basis for the claim, must have prevented petitioner from raising the claim." *McCleskey v. Zant*, 499 U.S. 467, 497 (1991).

Kelley did not pursue a direct appeal from his conviction and sentence. (ECF No. 305 at 2). He does not allege that the factual basis for this guidelines error claim was not reasonably available to him in time to pursue relief on direct appeal. He falsely asserts that he did not appeal because of an appeal waiver (ECF No. 305 at 3), but his Plea Agreement (ECF No. 142) contains no appeal waiver. He also vaguely alleges, "Defense Counsel abandoned Petitioner during critical stages of appellate proceedings." (ECF No. 305 at 4). He does not, however, specifically allege that defense counsel failed to file an appeal after having been instructed to do so. Nor does he make any allegation or showing that he attempted to pursue an appeal but was impeded from doing so by some external force. He has, therefore, failed to establish cause to excuse his procedural default on this claim.

Since Kelley has not shown adequate cause to overcome the procedural bar in his case, the Court need not consider the issue of actual prejudice. *Ashker v. Class*, 152 F.3d 863, 871 (8th Cir. 1998) (citing *Engle v. Isaac*, 456 U.S. 107, 134 n. 43 (1982)). Further, Kelley neither alleges nor demonstrates a miscarriage of justice through actual innocence. "Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim." *Schlup v. Delo*, 513 U.S. 298, 316 (1995). Kelley simply failed to pursue any relief on direct appeal, he cannot satisfy the "cause and prejudice" standard or demonstrate actual innocence, and his Guidelines error claim has been procedurally defaulted.

Beyond the procedural bar, ordinary guidelines interpretation claims are simply not cognizable under § 2255.  Few sentencing errors are of a constitutional nature that can support a § 2255 claim.  *See, e.g., Sawyer v. Whitley*, 505 U.S. 333, 348-50 (1992).  *Sawyer* has been limited to capital cases, and allegations of sentencing guidelines errors are not cognizable under § 2255 *unless the sentence imposed exceeds the statutory maximum.  See also: Sun Bear v. United States*, 644 F.3d 700, 708 (8th Cir. 2011) (en banc) (internal citations omitted) (§ 2255 does not apply to garden-variety Sentencing Guideline application issues); *Auman v. United States*, 67 F.3d 157, 161 (8th Cir. 1995) (ordinary questions of guideline interpretation falling short of the "miscarriage of justice" standard do not present a proper § 2255 claim); and *King v. United States*, 595 F.3d 844, 852 (8th Cir. 2010) (ordinary questions of guideline interpretation are not remediable on a § 2255 motion unless the error rises to the level of being a miscarriage of justice).  Kelley's sentence of 240 months imprisonment falls well within the statutory maximum sentence of 40 years provided by 21 U.S.C. § 841(b)(1)(B)(viii).  Kelley's guidelines misclassification claim is simply not cognizable in this § 2255 proceeding.

Even if the Court were to consider the merits of this claim, then as discussed in detail above, the Court did not err in considering drug quantities from dismissed counts as relevant conduct to calculate drug quantity for sentencing purposes.

### 5.    No Breach of the Plea Agreement

While not raised as a ground for relief in his § 2255 Motion, Kelley argues that the Government breached the plea agreement in his reply.  (ECF No. 309 at 4-5).  He asserts that "the drug quantity stipulated in paragraph [  ] of the plea agreement constituted the full scope of his relevant conduct" and introduction of additional evidence of drug quantity and advocating for

inclusion of uncharged drug trafficking breached the plea agreement. *Id*. He further contends that where the Government stipulated to a drug quantity and corresponding base offense level, and then initiates an effort at sentencing to obtain a higher drug quantity and base offense level, the Government breaches a plea agreement. *Id*. at 5. While this last proposition of law is correct, it does not apply to Kelley's case because the Government did not stipulate to a specific drug quantity and base offense level in the parties' plea agreement. Moreover, Kelley's breach of plea agreement claim was not raised on direct appeal and is procedurally barred.

The United States Supreme Court has "long and consistently affirmed that a collateral challenge may not do service for an appeal." *Frady,* 456 U.S. at 165; *see also United States v. Mosley*, 505 F.3d 804, 808 (8th Cir. 2007) (breach of plea agreement raised on direct appeal and reviewed under *de novo* standard). Kelley took no direct appeal. His plea agreement did not contain any waiver of the right to appeal. As previously stated, the failure to raise an issue on direct appeal generally constitutes a procedural default and precludes a defendant from raising the issue for the first time in a § 2255 motion. *Dejan*, 208 F.3d at 685. A procedural default may only be overcome if the defendant can first demonstrate "cause" and actual "prejudice," or that he is actually innocent. *Bousley*, 523 U.S. at 622; *Apfel*, 97 F.3d at 1076; and *Frady*, 456 U.S. at 167-68. "For cause to exist, the external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." *McCleskey,* 499 U.S. at 497. Kelley has failed to allege any impediment that would have prevented him from raising the breach of plea agreement claim on direct appeal. He has, therefore, failed to establish cause to excuse his procedural default on this issue, nor would he

be able to establish prejudice from the alleged breach as the record shows no breach of the plea agreement by the Government.

When a guilty plea is induced by an agreement, the government must abide by its terms. *Santobello v. New York*, 404 U.S. 257, 262 (1971) ("[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so it can be said to be part of the inducement or consideration, such promise must be fulfilled"); *see also United States v. E.V.*, 500 F.3d 747, 754 (8th Cir. 2007); Fed. R. Crim. P. 11(c)(1). The district court, however, is not bound by the plea agreement. *United States v. Martinez-Noriega*, 418 F.3d 809, 811 (8th Cir. 2005); Fed. R. Crim. P. 11(c)(3)(A). "After the district court has accepted a guilty plea, the government's material breach of the plea agreement violates the Defendant's due process rights." *United States v. Mosley*, 505 F.3d 804, 810 (8th Cir. 2007).

Here, the parties' written Plea Agreement provided that Kelley would plead guilty to Count Eight of the Second Superseding Indictment, charging him with distribution of more than five grams of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 841(b)(1)(B)(viii), and the Government agreed that once the Plea Agreement was accepted by the Court and sentence was pronounced, it would move to dismiss the remaining counts of the Second Superseding Indictment pending against Kelley. (ECF No. 142 at 1, ¶ 1). At sentencing, and after imposition of sentence was announced by the Court, the Government moved to dismiss Count One (as it pertained to Kelley), as well as Counts Five, Seven, Ten, and Eleven. (ECF No. 288 at 49). The motion was granted by the Court. *Id*. The Judgment also reflects that the United States moved to dismiss Counts One, Five, Seven, Ten, and Eleven of the Second Superseding Indictment – each of which charged offenses against Kelley. (ECF No. 203 at 1).

26

The Plea Agreement set forth the factual basis for the count of conviction, including the amount of methamphetamine associated with the charge.  (ECF No. 142 at 2-3, ¶ 5).  The Plea Agreement does not, however, contain a stipulation of drug quantity for guidelines calculation purposes or a stipulation as to the base offense level.  It does inform Kelley that the Guidelines are advisory but not mandatory, that the agreement does not promise a specific sentence, and that relevant conduct will be considered.  *Id*. at 8, ¶'s 16-18.  Kelley acknowledged that discussions had taken place concerning the possible guideline range which might be applicable to his case, and he agreed that any such discussions were "merely an attempt to guess at what appears to be the correct guideline range and do not bind the District Court," that "the actual range may be greater than contemplated by the parties," and in the event the actual guideline range was greater than the parties expected, Kelley agreed that this did not give him the right to withdraw his plea of guilty.  *Id*., ¶ 17.  These provisions clearly do not constitute an agreement and stipulation on drug quantity for guidelines calculation purposes and for a specific base offense level.  Kelley is simply mistaken.[7]

The Government did not breach the plea agreement.

### D.    No Evidentiary Hearing Is Warranted

A movant is not entitled to an evidentiary hearing on a § 2255 motion if "the motion and the files and records of the case conclusively show that the [movant] is entitled to no relief." *Nguyen*, 114 F.3d at 703 (quoting *Voytik v. United States*, 778 F.2d 1306, 1308 (8th Cir. 1985)).

---

[7] It appears Kelley's argument on this claim uses a template from a case in which a stipulation on drug quantity and base offense level was made, as a blank space is left for the appropriate paragraph number to be inserted, but Kelley left this space blank and made no paragraph reference as no such paragraph of the Plea Agreement exists.  (ECF No. 309 at 5).  This is further made apparent in the next paragraph of his argument, in which another blank space was left after the number "3" for the agreed upon base offense level.  No number is inserted after the "3" into the space, because there was no agreement and stipulation for a specific base offense level.

Such are the circumstances in this case where the record conclusively shows that Kelley's claims lack merit, are procedurally barred, or are not cognizable in a § 2255 proceeding.

### E.    No Certificate of Appealability is Warranted

A Certificate of Appealability may issue under 28 U.S.C.§ 2253 only if the applicant has made a substantial showing of the denial of a constitutional right. A "substantial showing" is one demonstrating that reasonable jurists could debate whether the petition should have been resolved in a different manner or the issues presented deserved further proceedings even though the petitioner did not prevail on the merits in the court considering his case. *Slack v. McDaniel*, 529 U.S. 473 (2000). Kelley has not made a substantial showing of the denial of a constitutional right, and a Certificate of Appealability should be denied.

### III.    CONCLUSION

For the reasons and upon the authorities discussed above, Kelley's guideline miscalculation claim has been procedurally defaulted, is not cognizable in this § 2255 proceeding, and is otherwise unsupported by the record in this case. Kelley's claims of ineffective assistance of counsel likewise find no support in the record. His claim that the Government breached the plea agreement has also been procedurally defaulted and has no merit. It is recommended that Kelley's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (ECF No. 305) be **DISMISSED with PREJUDICE**. It is further recommended that a request for a Certificate of Appealability be denied.

**The parties have fourteen (14) days from receipt of this Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely written objections may result in waiver of the right to appeal questions of fact. The parties**

**are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 18th day of January 2022.

/s/ Mark E. Ford

HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE